# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLORADO
# CHIEF JUDGE MARCIA S. KRIEGER

Criminal Action No. 17-cr-00336-MSK-GPG

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**DAVID MORA-ALVAREZ,**

    Defendant.

_____

**OPINION AND ORDER OVERRULING OBJECTIONS, ADOPTING
RECOMMENDATION, AND DENYING MOTION TO SUPPRESS**
_____

**THIS MATTER** comes before the Court pursuant to Mr. Mora-Alvarez's Objections (**#56**) to the Magistrate Judge's Recommendation (**# 43**) that Mr. Mora-Alvarez's Motion to Suppress (**# 24**) be denied, the Government's response (**# 57**), and Mr. Mora-Alvarez's reply (**#60**).

## FACTS

Mr. Mora-Alvarez is charged in a September 21, 2017 Indictment (**# 1**) with three counts of possessing controlled substances with an intent to distribute, in violation of 21 U.S.C. § 841(a) and (b)(1). Mr. Mora-Alvarez was apprehended, and the drugs in question were discovered, during to a traffic stop that occurred near Grand Junction, Colorado on July 5, 2017.

Mr. Mora-Alvarez moved (**# 24**) to suppress the fruits of that traffic stop, arguing that the law enforcement officer effectuating that stop lacked probable cause to initiate and prolong it. Magistrate Judge Gallagher conducted an evidentiary suppression hearing on July 13, 2018, and, at the conclusion of that hearing, recommended (**# 43**) that Mr. Mora-Alvarez's motion be

1

denied. Mr. Mora-Alvarez filed timely Objections **(# 56)** to that Recommendation pursuant to 28 U.S.C. § 636(b), and the matter is now before this Court.

The evidence adduced at the suppression hearing is discussed in detail below and merely summarized here. Only one witness, Colorado State Trooper Shane Gosnell, testified. Trooper Gosnell testified that at about 4:30 p.m. on July 5, 2017, he was parked in his vehicle at an emergency crossover, observing eastbound traffic on Interstate 70. He noticed a white sedan commit two violations of Colorado traffic law: traveling in the left lane of a highway without passing, and following too closely behind other vehicles. Based upon these observations, Trooper Gosnell pulled the sedan over.

When Trooper Gosnell approached the sedan, he also observed a strong smell of air-freshener, that the driver was visibly nervous, that the driver had vague travel plans, and that there were discrepancies in vehicle registration information. These, along with other observations raised Trooper Gosnell's suspicions that the driver, Mr. Mora-Alvarez, might be transporting illegal drugs. Trooper ran checks on Mr. Mora-Alvarez's license and the vehicle's registration. While doing so, he also searched various federal databases (identified at the hearing as "EPIC") and discovered that Mr. Mora-Alvarez had previously been involved in a currency seizure case initiated Drug Enforcement Administration.

Although he suspected that Mr. Mora-Alvarez might be involved in drug trafficking, Trooper Gosnell returned to Mr. Mora-Alvarez's vehicle, delivered a warning for the infraction, and returned Mr. Mora-Alvarez's documents. Trooper Gosnell engaged Mr. Mora-Alvarez in additional conversation, and eventually asked permission to search the vehicle. Mr. Mora-Alvarez initially gave such consent, but then withdrew it. Trooper Gosnell asked Mr. Mora-Alvarez to exit the vehicle, and Trooper Gosnell summoned his canine unit to perform a sniff

search of the vehicle. The dog gave a non-conclusive indication of concern near the front passenger side of the vehicle. Although the dog did not give a full alert, Trooper Gosnell then searched the vehicle, eventually discovering a hidden compartment with considerable quantities of several drugs.

Mr. Mora-Alvarez's Motion to Suppress **(# 24)** raises three issues: (i) that Trooper Gosnell lacked probable cause to initiate the traffic stop, as there are no concrete standards to define the traffic offense of "following too closely" and because Trooper Gosnell's own driving actions "caused Mr. Mora-Alvaraz'(sic) allegedly illegal driving pattern"; (ii) after completing the traffic stop, Trooper Gosnell "re-seized" Mr. Mora-Alvarez by asking to search the vehicle and proceeding to conduct a canine search, all without probable cause; and (iii) the dog's inconclusive "alert" did not provide probable cause for Trooper Gosnell to conduct a hand-search of Mr. Mora-Alvarez's vehicle.

Following the hearing, Magistrate Judge Gallagher orally recommended that Mr. Mora-Alvarez's motion be denied. Judge Gallagher stated, in pertinent part, that: (i) because "we're in a motions hearing position, . . . the evidence must be looked at in the light most favorable to the government"; (ii) that the initial traffic stop was premised upon Mr. Mora-Alvarez driving in the left lane without passing, a violation of Colorado law, and that Trooper Gosnell had reasonable suspicion to stop Mr. Mora-Alvarez for that violation; (iii) that Trooper Gosnell also had reasonable suspicion to stop Mr. Mora-Alvarez for the separate violation of "following too closely," as Mr. Mora-Alvarez was "within two car lengths or one second" behind a leading vehicle while traveling at 65-70 mph, relying upon *U.S. v. Hunter*, 663 F.3d 1136 (10th Cir. 2011); (iv) to the extent that Trooper Gosnell extended the stop by consulting the EPIC database, Trooper Gosnell had reasonable suspicion to do so based on his observations of various matters –

Mr. Mora-Alvarez's shaking, nervousness, his California driver's license and Nevada license plates, the registration of the vehicle in a different name, a salvage title and high mileage on the vehicle, and various other factors, taken together; (v) that Trooper Gosnell's exchanges with Mr. Mora-Alvarez about his travel plans did <u>not</u> materially contribute to any further suspicion on Trooper Gosnell's part; (vi) that Trooper Gosnell had reasonable suspicion to extend the encounter to conduct the canine search, over Mr. Mora-Alvarez's objection, apparently because Mr. Mora-Alvarez demonstrated "tunnel vision because of his nervousness" by failing to recall that Trooper Gosnell had returned his documents, because Trooper Gosnell observed Mr. Mora-Alvarez to be sweating heavily, and possibly because Mr. Mora-Alvarez stated that he wanted to go to the bathroom but refused Trooper Gosnell's invitation to do so by the side of the road; and (vii) that the canine unit's giving of a preliminary alert, but not a final one, nevertheless provided probable cause to conduct a physical search of the vehicle, pursuant to *U.S. v. Moore*, 795 F.3d 1224 (10th Cir. 2015).

Mr. Mora-Alvarez filed timely Objections **(# 56)** to the Magistrate Judge's Recommendation, arguing: (i) the Magistrate Judge applied an incorrect standard in evaluating the evidence by viewing it in the light most favorable to the Government; (ii) the Magistrate Judge erred in finding that "reasonable suspicion," rather than probable cause, was sufficient to justify the initial traffic stop; (iii) Trooper Gosnell failed to provide sufficient factual detail about the particular circumstances to justify the conclusion that he had probable cause to stop Mr. Mora-Alvarez for a passing lane violation; (iv) that Trooper Gosnell's own violations of Colorado traffic law while approaching Mr. Mora-Alvarez (speeding in excess of 100 mph, remaining in the left lane without passing, etc.) "[created] a myopic view of circumstances" that call into question Trooper Gosnell's conclusions about whether Mr. Mora-Alvarez was following

4

too closely behind another vehicle; and (v) in relying upon Mr. Mora-Alvarez's nervousness as grounds to prolong the stop, the Magistrate Judge erred in not considering whether Mr. Mora-Alvarez believed that Trooper Gosnell "was targeting him and attempting to manufacture probable cause," and that the Magistrate Judge further failed to weigh the totality of the circumstances because of the Magistrate Judge's articulation of an improper standard of review.

## ANALYSIS

### A. Standard of review

The Magistrate Judge's Recommendation was issued pursuant to 28 U.S.C. §636(b)(1)(B). Under that statute, this Court makes a "*de novo* determination of those portions of the . . . recommendations to which objection is made." Notably, the requirement is that this Court conduct a *de novo* <u>determination</u>, not necessarily a *de novo* <u>hearing</u>. The Court is possessed of wide discretion to accept, reject, or modify the Magistrate Judge's proposed findings, including resolving issues of credibility. *U.S. v. Raddatz,* 447 U.S. 667, 676 (1980).

### B. Magistrate Judge's announced standard

The Magistrate Judge twice stated that he was applying a standard whereby "the evidence must be looked at in the light most favorable to the government." This standard governs <u>appellate</u> review of a trial court's decision to suppress evidence, but the trial court has the obligation in the first instance to assess the credibility of witnesses and determine the weight to be given to the evidence presented. *U.S. v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).

Mr. Mora-Alvarez argues that, because the Magistrate Judge announced an incorrect standard, this Court should conduct its own *de novo* hearing. Such an argument has a superficial appeal. To the extent that the Magistrate Judge was required to make findings about the credibility of Trooper Gosnell, an argument could be made that the Magistrate Judge's deference

to the Government forced the Magistrate Judge to credit testimony by Trooper Gosnell. In contrast, had the Magistrate Judge applied the correct standard, the Magistrate Judge might have chosen to discredit that same testimony. If the Magistrate Judge's credibility findings are suspect, *Raddatz* strongly implies that this Court should conduct a *de novo* hearing. 447 U.S. at 676 n. 7 (a trial court rejecting a Magistrate Judge's credibility findings and substituting its own assessment of witnesses' credibility "without seeing and hearing the witness [ ] whose credibility is in question could well give rise to serious questions").

But a careful review of the entire record reveals no credibility determination that bears upon the issues raised. Mr. Mora-Alvarez notably argues in his Objections that the Magistrate Judge "made no findings as to the credibility of Trooper Gosnell". More importantly, Mr. Mora-Alvarez makes no challenge to the truthfulness of Trooper Gosnell's testimony, only to the legal weight it should be given.

The record here includes the transcript of Trooper Gosnell's testimony, the audio recording of the hearing, and the video cam recording taken from the dash camera of Trooper Gosnell's vehicle. The only difference between this Court's review of the evidence and the Magistrate Judge's is that this Court lacked the ability to see Trooper Gosnell as he testified. Given that there is no suggestion by Mr. Mora-Alvarez that the way he testified (how he sat, his body language etc) would bear upon assessment of the truthfulness or believability of his statements, it does not appear that a *de novo* hearing is necessary to make a *de novo* determination on the Motion to Suppress. as to Trooper Gosnell's credibility.

Moreover, the Court also notes that Trooper Gosnell was the only witness at the hearing; neither Mr. Mora-Alvarez nor any other witness testified that Trooper Gosnell's testimony was factually incorrect – *e.g.* that, contrary to Trooper Gosnell's observations of Mr. Mora-Alvarez

6

as nervous and shaking during the stop, that Mr. Mora-Alvarez was, in fact, calm and collected. Rather, Mr. Mora-Alvarez's cross-examination and argument appeared to accept Trooper Gosnell's observations as correct, but contended that the Court should draw different conclusions from those observations that Trooper Gosnell did. For example, Trooper Gosnell's perceptions that Mr. Mora-Alvarez was sweating and shaking are not disputed. Mr. Mora-Alvarez challenges only Trooper Gosnell's explanation of what he perceived to be the cause – nervousness or some other explanation. In closing argument, counsel for Mr. Mora-Alvarez argued:

> Mr. Mora-Alvarez is a sweaty guy . . . He's a heavy guy, he's sweaty, he's in a desert. It's 106 degrees outside. He's being pulled over. He doesn't have a lot of money. He's obviously a blue-collar guy. He's driving an old Camry with 60,000 miles on it that's probably not in great condition because it's got a whole bunch of air-fresheners in it. He's not dressed like he has money.

Similarly, Mr. Mora-Alvarez does not dispute that Trooper Gosnell correctly observed that Mr. Mora-Alvarez was wearing a thin red bracelet associated with the Catholica saint Santa Muerte. He only disputes whether it is appropriate to conclude that the bracelet should be understood to associate him with drug traffickers (who, Trooper Gosnell testified, are known to venerate Santa Muerte), or whether it associates him with other law-abiding citizens (such as the LGBT community) who also venerate Santa Muerte.

Thus, Mr. Mora-Alvarez does not appear to challenge the truthfulness of Trooper Gosnell's statements as to what he observed, but instead Mr. Mora-Alvarez challenges the <u>weight</u> or significance that should be given to such observations. Since those challenges were raised by Mr. Mora-Alvarez in cross-examination and argument, this Court can consider them in its *de novo* review without the need for another hearing.

**C. Initial stop**

A traffic stop is a seizure under the Fourth Amendment, and thus the officer initiating it must have reasonable suspicion that "this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *U.S. v. Salas*, 756 F.3d 1196, 1200-01 (10th Cir. 2014). Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances and the officer's subjective motivation for the stop is irrelevant. *Id.* at 1201. The Government bears the burden of proving the reasonableness of the officer's suspicion at all pertinent stages of the encounter. *U.S. v. Vance*, 893 F.3d 763, 773 (10th Cir. 2018).

The Government contends that Trooper Gosnell had two, separate justifications for stopping Mr. Mora-Alvarez's vehicle: his observation of Mr. Mora-Alvarez traveling in the left lane without overtaking (a violation of C.R.S. § 42-4-1013), and Mr. Mora-Alvarez following too closely behind a truck (a violation of C.R.S. § 42-4-1008). Mr. Mora-Alvarez has made no objection to the Magistrate Judge's finding the initial stop was justified by either of these violations, and thus, if either justification is supported by the record, the initial stop was lawful.

A. <u>Passing lane violation</u>

C.R.S. § 42-4-1013(1) provides that "a person shall not drive a motor vehicle in the passing lane of a highway if the speed limit is sixty-five miles per hour or more unless such person is passing other motor vehicles that are in a non-passing lane . . . unless the volume of traffic does not permit the motor vehicle to safely merge into a non-passing lane." The statute goes on to define "passing lane" to be the left lane of a two-lane highway, and the right lane to be a "non-passing lane." C.R.S. § 42-4-1013(2). Trooper Gosnell's dashcam was not on when he observed Mr. Mora-Alvarez allegedly violate that statute, leaving Trooper Gosnell's

testimony as the sole evidence establishing this infraction. Trooper Gosnell testified that the speed limit on this section of highway was 75 mph, and that he observed Mr. Mora-Alvarez's vehicle "traveling in the left lane, not passing, just kind of hanging out." On cross-examination, Trooper Gosnell described the event in slightly more detail:

> there was a significant space between [some] commercial motor vehicles and, I believe, a pickup and a trailer and a van. When [Mr. Mora-Alvarez] first approached my location and then drove past my location, he was in the left lane between those two vehicles and the commercial motor vehicles, hanging out just behind the commercial motor vehicle, so he wasn't actively passing; he was in the space between them in the left lane.

Mr. Mora-Alvarez did not cross-examine Trooper Gosnell on his observations about this point in the incident, leaving his testimony unchallenged. In his Objections, Mr. Mora-Alvarez does not argue that he was <u>not</u> traveling in the passing lane, but instead argues that Trooper Gosnell gave "no testimony establishing the distance over which [Mr. Mora-Alvarez's] vehicle is observed . . . or the relative position of the semis it was in 'close proximity to'," such that "it is not possible to judge whether 'the volume of traffic' would 'permit [Mr. Mora-Alvarez's vehicle to safely merge into a non-passing lane.'"[1]

Because there is neither argument or evidence to rebut Trooper Gosnell's testimony as to whether Mr. Mora-Alvarez was in the left lane without passing, the Court takes that testimony as true. Mr. Mora-Alvarez's argument that Trooper Gosnell failed to testify as to whether the volume of traffic would have permitted Mr. Mora-Alvarez to return to a non-passing lane is

---

[1] Mr. Mora-Alvarez also argues that "a vehicle may lose its relative speed advantage when passing carries momentarily onto an upgrade, yet be unable to safely merge to its right because of the position of the traffic in that lane," suggesting that this is a possible alternative explanation for Trooper Gosnell's observations. Had Mr. Mora-Alvarez taken the stand and testified that this is what occurred, the outcome might be different. But he did not, and thus, the testimony of Trooper Gosnell that a "significant space" existed for Mr. Mora-Alvarez to merge into once it became clear that he would be unable to pass remains unchallenged.

without merit, as Trooper Gosnell unrebutted testimony was that "there was a significant space" between the vehicles that would have allowed Mr. Mora-Alvarez to return to the right lane. Mr. Mora-Alvarez's argument that Trooper Gosnell did not testify about the distance over which he observed Mr. Mora-Alvarez traveling at this time is irrelevant, as the statute does not dictate any particular distance that a vehicle must travel in the passing lane before a violation occurs. Thus, Trooper Gosnell's unrebutted and unchallenged testimony establishes that he had a reasonable suspicion to believe that Mr. Mora-Alvarez had violated C.R.S. § 42-4-1013(1), justifying the initial stop.

    B. <u>Following too closely</u>

 C.R.S. § 42-4-1008(1) provides that "the driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." The statute does not elaborate on the definition of "reasonable and prudent," but Trooper Gosnell testified that he typically considered that 1.6 seconds is the amount of time it takes to perceive a danger and physically react to it (*e.g.* by applying the brakes), and that the Colorado Driver's Handbook, a non-binding guide for drivers, suggests that vehicles traveling at 60-65 mph maintain a separation of at least three seconds.

 This portion of the encounter is captured on the dashcam video. Trooper Gosnell approaches Mr. Mora-Alvarez's vehicle beginning at approximately 15:40:08, at which point in time Mr. Mora-Alvarez is driving behind a blue truck. Trooper Gosnell proceeds to pace Mr. Mora-Alvarez's vehicle, first pulling up along side it (at a speed of approximately 60-65 mph, according to vehicle data displayed alongside the video), and then later dropping back behind it. Approximately 50 seconds after Trooper Gosnell approached Mr. Mora-Alvarez's vehicle, Mr.

10

Mora-Alvarez pulled into the left lane and passed the blue truck, and Trooper Gosnell pulled Mr. Mora-Alvarez over a short distance later.

Although video images are subject to optical distortions such as foreshortening and parallax, it is possible for this Court to approximate the distance between Mr. Mora-Alvarez's vehicle and the blue truck at various points in time by using the shadows of the vehicles, the lane markings on the highway, and the time stamp on the video. For example, at 15:40:13 on the video, the blue truck's shadow – marking the rear of that vehicle – passes over a certain segment of the dashed highway line. Stepping through the video, frame by frame, the shadow of the front of Mr. Mora-Alvarez's passes that same line segment at 15:40:14, one second (and perhaps additional fractions thereof[2]) later. The gap between vehicles remains at approximately 1 to 1.5 seconds for at least 15 seconds more before Trooper Gosnell drops back and Mr. Mora-Alvarez passes the truck.

Admittedly, C.R.S. § 42-4-1008's "reasonable and prudent" standard leaves considerable discretion to the police officer enforcing it. But Mr. Mora-Alvarez did not challenge Trooper Gosnell's testimony that traffic enforcement training suggests that a gap of less than 1.6 seconds between vehicles traveling at highway speeds is imprudent, and that Colorado's non-binding driver's handbook suggests a gap of 3 seconds to be reasonable and safe.

The Magistrate Judge relied on *U.S. v. Hunter*, 663 F.3d 1136, 1143 (10th Cir. 2011), in which the 10th Circuit held that a police officer's observation of a vehicle that was traveling at highway speeds behind another vehicle with only a one-second gap provided sufficient cause to stop that vehicle for violating Kansas' similar following-too-closely statute. Mr. Mora-Alvarez

---

[2] The video's time coding is limited to full seconds, not tenths or hundredths thereof. Approximately 30 separate frames of video occur for each second of time recorded in the video's time coding.

11

argues in his Objections that *Hunter* is factually distinguishable because here, Trooper Gosnell himself violated various aspects of Colorado's traffic law -- excessive speed, driving in the passing lane, etc. -- when approaching and pacing Mr. Mora-Alvarez, whereas the officer in *Hunter* did not. The precise import of this argument is unclear. Trooper Gosnell's own vehicular (mis-)conduct would only be relevant to the extent it can be said to have caused Mr. Mora-Alvarez to commit a vehicular infraction. Mr. Mora-Alvarez did not testify that Trooper Gosnell's driving caused him to follow the blue truck too closely and there does not appear to be any correlation between Trooper Gosnell's behavior and Mr. Mora-Alvarez' behavior apparent from the dashcam video recording. In the absence of evidence, the Court will not assume that a police officer's high-speed approach in the passing lane would reasonably cause a driver in the right-hand lane to follow the vehicle in front of him <u>more</u> closely; if anything, the Court assumes a prudent driver would <u>reduce</u> speed and await the police officer's next action or instruction. Accordingly, this Court agrees with the Magistrate Judge that *Hunter* supports the Government's contention that Trooper Gosnell had reasonable suspicion to stop Mr. Mora-Alvarez for following too closely in violation of C.R.S. § 42-4-1008.

**D. Duration of initial stop**

Once a traffic stop is made, its duration must be limited to the scope and circumstances that initially justified it. *U.S. v. Wallace*, 429 F.3d 969, 974 (10th Cir. 2005). However, if, in the course of the stop, the officer acquires a particularized and objective basis for suspecting that the person stopped is engaged in other criminal activity, the officer may extend the stop to investigate further. *U.S. v. Kitchell*, 653 F.3d 1206, 1217-18 (10th Cir. 2011).

The dashcam video reflects that, after speaking to Mr. Mora-Alvarez and obtaining his documentation, Trooper Gosnell returns to his vehicle at approximately 15:45:00 to review Mr.

Mora-Alvarez's papers. Trooper Gosnell testified that he typically conducts a check of the NCIC/CCIC records "to check to see if it is a valid driver's license [and] if they have any warrants." The record does not reflect how Trooper Gosnell conducts those checks and how long they take. He also testified that, when he believes that he has a reasonable suspicion of criminal activity, he also conducts, by telephone, a search of the EPIC database to see if "there's any ongoing current or past cases with any of the federal agencies," and that he did so in this case. At approximately 15:53:00, Trooper Gosnell can be heard discussing the situation with another officer, Deputy Miller, who has arrived on scene. Thirty seconds later, Trooper Gosnell exits his car and returns to speak with Mr. Mora-Alvarez to return his paperwork and deliver a warning.

It is not clear whether and to what extent Mr. Mora-Alvarez contends that the duration of this portion of the stop violated his Fourth Amendment rights. Certainly, it cannot be disputed that Trooper Gosnell was entitled to take a reasonable amount of time to verify the validity of Mr. Mora-Alvarez's license, registration, and insurance, and to ensure that he was not the subject of any outstanding warrants. *U.S. v. Moore*, 795 F.3d 1224, 1228-29 (10th Cir. 2015). An argument could be made – although it is not clear that Mr. Mora-Alvarez makes it – that if Trooper Gosnell <u>further</u> delayed the stop beyond this point in order to consult the EPIC database, that delay would constitute a Fourth Amendment violation unless Trooper Gosnell had a reasonable suspicion to justify it. The parties argued, at some length, over whether Trooper Gosnell's observations about Mr. Mora-Alvarez and his vehicle supplied sufficient reasonable suspicion for Trooper Gosnell to take <u>some</u> action, but it is unclear to the Court exactly what action that was – that is, whether it was consulting the EPIC databases or performing the canine search. *See infra.*

13

To the extent Mr. Mora-Alvarez is arguing that Trooper Gosnell needlessly prolonged this initial detention by consulting the EPIC database, the Court finds that the record does not support such a challenge. As noted above, the record is largely silent regarding the time Trooper Gosnell spent performing routine license and warrant checks and how much time he spent performing the search of the EPIC database. At best, the record seems to suggest that Trooper Gosnell performs both tasks simultaneously. Thus, in the absence of evidence suggesting that Trooper Gosnell completed the license and registration checks early, then waited to complete the EPIC database checks before concluding the traffic stop with Mr. Mora-Alvarez, the Court cannot conclude that Trooper Gosnell prolonged the stop in any way and thus, the Court need not proceed to consider the question of whether Trooper Gosnell had reasonable suspicion to do so.[3]

### E. Conclusion of stop and additional questions

Once the purpose of the initial stop has been completed – *e.g.* once the driver has been ticketed, warned, or the purpose of the stop has otherwise been addressed – the driver must be permitted to proceed. The officer may extend the stop beyond that point only if he has a reasonable, articulatable suspicion of other crimes or where the driver voluntarily consents to further questioning. Where the officer relies upon the driver's consent to continue the encounter, that consent must be given after it would otherwise appear to a reasonable person under the circumstances that he would be free to leave or disregard the officer's further questions. If a consensual encounter has begun, the officer is not obligated to remind the driver that he does not have to answer questions or that he is free to leave at any time, but if the driver has an objective

---

[3] To the extent that the record could support an argument by Mr. Mora-Alvarez that Trooper Gosnell unduly prolonged this portion of the stop by consulting the EPIC database, the Court would find, for most of the reasons set forth in Section F of this Opinion, that Trooper Gosnell has reasonable suspicion to do so.

14

reason to believe that he or she is not free to end the conversation and proceed on his or her own way, the driver's consent will not support a continued detention. *Wallace*, 429 F.3d at 974-75.

At 15:54:30, Trooper Gosnell returns Mr. Mora-Alvarez's documents and states "You're free to go. That's just a warning, alright? Do you have any questions for me?" Mr. Mora-Alvarez apparently answers "no," and Trooper Gosnell says, "Thank you for your time" and begins to walk away from the car.[4] Mr. Mora-Alvarez quickly calls Trooper Gosnell back to the car, stating that he believes that Trooper Gosnell had not returned his registration. Trooper Gosnell states that he believes he did, but goes back to his car to double-check. After a roughly 15-second search of his own car, Trooper Gosnell tells Deputy Miller, who is standing near Mr. Mora-Alvarez's car, "tell him to check his stuff." A moment later, it appears that Mr. Mora-Alvarez discovers that he did have his registration, and Deputy Miller informs Trooper Gosnell. Trooper Gosnell returns to Mr. Mora-Alvarez's car, verifies that Mr. Mora-Alvarez had his registration, states "I thought I gave it back," and then asks Mr. Mora-Alvarez "do you mind if I ask you a few more questions?" Trooper Gosnell proceeds to ask whether "is there anything illegal in the car that I should know about?" Trooper Gosnell proceeds to list off several types of controlled substances, apparently receiving a "no" from Mr. Mora-Alvarez about each.

The question of whether a defendant has voluntarily consented to continue a traffic stop after it has concluded presents a question of fact to be determined from all of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). Once the officer has returned the defendant's

---

[4]  Mr. Mora-Alvarez argues that Trooper Gosnell's statement that he was "free to go" was a lie, and that Trooper Gosnell's *modus operandi* is to inform drivers that they are free to go when, in fact, Trooper Gosnell fully intends to find a reason to continue to detain the driver and effectuate a search of their vehicle. Even assuming that Mr. Mora-Alvarez is correct, Trooper Gosnell's subjective intentions are irrelevant to the Fourth Amendment analysis, which considers only whether the stop was objectively justified. *Kitchell*, 653 F.3d at 1216.

15

documents, the analysis turns on whether the defendant "has an objective reasons to believe that he was not free to end his conversation with the law enforcement officer and proceed on his way." *U.S. v. West*, 219 F.3d 1171, 1176-77 (10th Cir. 2000). Among the circumstances that might preclude a finding of voluntary consent might be "a coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled." *Id.*

Here, the Court notes that, by the time Trooper Gosnell began asking additional questions to Mr. Mora-Alvarez, he had already returned Mr. Mora-Alvarez's documents and told him he was free to go. The video reflects that Trooper Gosnell's tone of voice was calm and casual when he asked if he could ask Mr. Mora-Alvarez more questions, and he stood on the passenger's side of the vehicle, allowing Mr. Mora-Alvarez the ability to drive away at any time. The only factor that even suggests a possible coercive presence was that of Deputy Miller, standing approximately a foot away from the driver's side door of Mr. Mora-Alvarez's vehicle with his arms crossed. In *West,* the 10th Circuit found that an officer's presence near the defendant's vehicle did not convert the driver's voluntary answers into coerced ones where the officer "did not hold, detain, or block the vehicle" and where he did not "use[ ] a commanding or threatening manner or tone of voice, display[ ] a weapon, or block the vehicle." *Id.* at 1177. Given the clear evidence on the video, this Court finds that Deputy Miller's presence alone was not sufficient to convert Mr. Mora-Alvarez's voluntary continuation of the stop into a coerced one, particularly after Trooper Gosnell had clearly informed Mr. Mora-Alvarez that he was free to go.

### F. The search

At this point in time, Trooper Gosnell then asked Mr. Mora-Alvarez if he could search the vehicle. Mr. Mora-Alvarez initially deflected the question, stating that he "really had to pee." Trooper Gosnell said that Mr. Mora-Alvarez could do so by the side of the road if he wished. Trooper Gosnell then stated "I believe you are involved in criminal activity. I'd like to search it to make sure you're not." Mr. Mora-Alvarez responded, "I'm not." Trooper Gosnell then asked again, "Can I search the vehicle?" Mr. Mora-Alvarez initially responded affirmatively, but as soon as Trooper Gosnell stated that "it's voluntary and you do have the right to refuse," Mr. Mora-Alvarez responded that "then I'd like to go." At that point, Trooper Gosnell stated that "I'm going to run my dog around the vehicle real quick."

Trooper Gosnell then had Mr. Mora-Alvarez step out of the vehicle and Trooper Gosnell retrieved his canine unit from his car. The video shows Trooper Gosnell and the dog then circled Mr. Mora-Alvarez's vehicle twice. The first loop, Trooper Gosnell explained in testimony, should "be pretty smooth unless they come into odor" of drugs, in which case the dog "will go back and he will slow down, trying to locate the source." The video shows that, on the first loop, the dog moved quickly around the car, beginning at the driver's door. The dog then paused near the front passenger's side, returned to the rear of the car, then went back to the passenger's front side. At the conclusion of the second pass, which Trooper Gosnell testified was a "detailed pass" whereby the handler points out specific areas for the dog to inspect, Trooper Gosnell reported that, although the dog did not give a "final indication" that it had specifically located the source of an odor, he observed from the dog's behavior that "there's something underneath, real deep, but [the dog] can't figure out what the source is." Based on the dog's indication, Trooper Gosnell and Deputy Miller proceeded to conduct a hand search of the vehicle, locating drugs.

17

At this point in the encounter, there can be no dispute that Mr. Mora-Alvarez had ceased any voluntary cooperation, requiring that the subsequent search of the vehicle be grounded in a reasonable suspicion of criminal activity. Trooper Gosnell testified that his suspicion arose from a variety of factors: (i) Mr. Mora-Alvarez's atypical nervousness, sweating, and shaking; (ii) the fact that Mr. Mora-Alvarez's driver's license was issued from California but his vehicle was registered in Nevada, as drug couriers are often provided a vehicle from elsewhere to drive; (iii) the fact that the vehicle's insurance was issued to a different individual, Anna Gonzales (who Mr. Mora-Alvarez indicated was his wife); (iv) that the vehicle was registered only recently, with a salvage title, which Trooper Gosnell considered to be additional indicia of drug trafficking; (v) an overwhelming odor of air freshener in the vehicle, a tactic used by drug traffickers to conceal the scent of drugs; and (vi) that Mr. Mora-Alvarez was wearing a bracelet associated with Santa Muerte, a saint associated with drug trafficking (and, as Mr. Mora-Alvarez's counsel elicited on cross-exam, many other law-abiding professions as well). Trooper Gosnell also considered the information he had received about Mr. Mora-Alvarez being involved in a civil forfeiture action involving the DEA, and his confusion about whether he had received his registration at the end of the initial stop to be an example of "tunnel vision," which can be an additional indication of prolonged nervousness.

In *Moore*, the 10th Circuit noted found that an officer's reasonable suspicion of criminal activity was sufficient when it was based on observations of the subject's "extreme and persistent nervousness" (over and above the typical degree of nervousness that most persons evidence when interacting with law enforcement), evidence that the subject had prior involvement with criminal activity, and the recent registration of the subject's vehicle. 795 F.3d at 1230-31. Each of these factors, to some degree, were present here (treating Mr. Mora-Alvarez's involvement

with a DEA currency forfeiture case as a connection to, if not actual conviction of, criminal activity). Other cases have noted that a strong odor of air freshener is another factor that may also contribute to reasonable suspicion of drug trafficking. *U.S. v. West*, 219 F.3d 1171, 1178-79 (10th Cir. 2000). Ultimately, the standard of "reasonable suspicion" is "not meant to be an onerous" one. *Moore*, 795 F.3d at 1232. Taking the various factors articulated by Trooper Gosnell, the Court finds that Trooper Gosnell had a sufficiently-articulated reasonable suspicion that Mr. Mora-Alvarez was engaged in drug trafficking to continue the stop over Mr. Mora-Alvarez's objection to allow a canine search of the vehicle. Mr. Mora-Alvarez is correct that each of these factors, examined alone, could also be justified with an innocent explanation, but the Court is satisfied that, taken together, the circumstances suffice to meet the "reasonable suspicion" standard.

That leaves only the question of whether a hand search of the vehicle was justified by the canine unit's preliminary alert but failure to deliver a final alert. The Court notes that Mr. Mora-Alvarez's Objections do not specifically challenge the Magistrate Judge's recommendation that the Court find the canine search provided sufficient cause for the officers' final hand search of Mr. Mora-Alvarez's vehicle. In any event, Trooper Gosnell testified that he observed several behaviors from the canine unit – *e.g.* "head snaps" and increased breathing -- that are indicative of the dog sensing the presence of prohibited narcotics. However, the canine unit did not give a "final indication" of an alert. In *Moore*, the 10th Circuit explained that "an alert, or a change in a dog's behavior in reaction to the odor of drugs, is sufficient to establish probable cause to search a vehicle, and that a final indication is not necessary. 795 F.3d at 1232.

19

## CONCLUSION

Accordingly, upon *de novo* consideration, the Court finds that Trooper Gosnell had sufficient cause to initiate the traffic stop and to continue with that stop at each critical phase. Because the Government has shown that Trooper Gosnell's search did not violate the Fourth Amendment, Mr. Mora-Alvarez's Objections **(# 56)** are overruled and his Motion to Suppress **(#4)** is denied. The parties shall promptly contact Magistrate Judge Gallagher to schedule further proceedings in this action, consistent with the Speedy Trial Act.

Dated this 14th day of December, 2018.

**BY THE COURT:**

_/s/ Marcia S. Krieger_

Marcia S. Krieger
Chief United States District Judge